UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-CV-0672-B |
| | § | |
| COCKERELL | § | |
| DERMATOPATHOLOGY, P.A. and | § | |
| CLAY J. COCKERELL, M.D., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court is Defendants Cockerell Dermatopathology, P.A. ("CDP") and Clay J. Cockerell, M.D. ("Cockerell")'s Motion to Dismiss (Doc. 6) the third cause of action in the Government's Complaint (Doc. 1) for failure to state a claim per Federal Rule of Civil Procedure 9(b). At issue here is whether the United States ("Government") sufficiently pleaded an obligation with the particularity as required by Rule 9(b), and whether the reverse false claim is redundant of the other false claims. For the following reasons, the Court **DENIES** Defendants' Motion.

# I.

# BACKGROUND

A.     *Factual Background*[1]

This is a qui tam[2] suit with claims pursuant to the False Claims Act ("FCA") for Defendants'
submission of false claims, conspiracy to violate the FCA, and failure to reimburse the federal
government for overpayments, along with federal common law claims of unjust enrichment and
payment by mistake. Only the third cause of action—failure to reimburse the federal government—is
at issue in this Motion to Dismiss.

Scott Schuster ("Schuster") and Dustin Rall ("Rall") owned and served as members of the
Board of Directors for the Medicine Store Pharmacy, Inc. d/b/a Rxpress Pharmacy ("Rxpress") in
Fort Worth, Texas. Doc. 1, Compl. ¶ 76. Quintan Cockerell ("Quintan")—Cockerell's
nephew—and Luke Zeutzius ("Zeutzius") worked as marketers for Rxpress. *Id.* Rxpress relied on "a
network of marketers to generate referrals for expensive 'compound' medications, such as pain
creams." *Id.* ¶ 78. The marketers received a commission for referrals that they generated. *Id.*
"Schuster, Rall, Zeutzius, and Quintan sought out TRICARE referrals" because of their "high
reimbursements." *Id.* Neither Schuster, Rall, Zeutzius, nor Quintan were physicians or registered
healthcare providers. *Id.* ¶ 77.

On May 1, 2015, TRICARE changed its screening process for compound drug claims, which
resulted in TRICARE paying fewer compound drug claims. *Id.* ¶ 79. As a result of this change,

---

[1] The Court draws the following factual account from the Government's Complaint (Doc. 1).

[2] "'Qui tam' is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which
means 'who as well for the king as for himself sues in this matter.'" *United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180, 184 n.5 (5th Cir. 2009) (quoting Black's Law Dictionary 1262 (7th ed. 1999)).

"Schuster, Rall, Zeutzius, and Quintan looked towards toxicology and [pharmacogenomic] tests as a potential source of revenue." *Id.* ¶ 80. Pharmacogenomic ("PG") testing tests "for specific genetic variations that may affect the way that individuals react to certain medications." *Id.* ¶ 33.

Defendant Cockerell owns and serves as president of CDP, a dermatopathology[3] lab that opened in or around June 2013. *Id.* ¶¶ 2, 74. Cockerell emailed Schuster and Quintan on November 10, 2014, about forming a genomics lab premised on Rxpress's marketing strategy. *Id.* ¶ 87. The new business enterprise would use the same business model as Rxpress where the "principals used their network of marketers to generate referrals for clinical lab tests" in exchange for a commission to the marketers for the referrals. *Id.* ¶ 85. Schuster, Rall, Zeutzius, and Quintan formed Progen Lab Systems, LLC ("Progen") on or around December 9, 2014, but Progen did not have a Clinical Laboratory Improvement Amendments of 1988 ("CLIA") license that allowed it to perform laboratory tests or a National Provider Identifier ("NPI") that allowed it to bill TRICARE. *Id.* ¶¶ 35, 46, 81. Therefore, Cockerell allowed Progen to use CDP's CLIA license. *Id.* ¶¶ 88, 93. On or around February 26, 2015, CDP applied to the Centers for Medicare & Medicaid Services ("CMS") to add toxicology to its CLIA license, but CDP did not inform the center that Progen would perform the testing. *Id.* ¶ 101. The license addition was approved on May 23, 2015. *Id.*

CDP and Progen entered into a Management Services and Operations Agreement ("MSA") on March 10, 2015, whereby "Progen would acquire space, equipment, personnel, and supplies for CDP's toxicology and genomic testing" and "perform the toxicology and genomic tests for CDP." *Id.* ¶ 93. Progen then leased a suite from CDP for its lab space. *Id.* ¶ 100. The agreement also contained a revenue sharing clause whereby "Progen would receive 80 percent of the net revenues for the

---

[3] Dermatopathology involves the study of cutaneous diseases—usually involving skin samples—at the microscopic level. *Id.* ¶¶ 74.

laboratory services, and CDP would keep the remaining 20 percent." *Id.* ¶ 95. Significantly, the agreement prohibited either party from "perform[ing] any services in the lab for any patients enrolled in . . . federal or state healthcare programs" and provided that CDP "would not accept reimbursement from federal healthcare programs for Progen's referrals." *Id.* ¶¶ 96–97. Progen also agreed to indemnify and hold harmless CDP for any negligence or misconduct caused by Progen. *Id.* ¶ 98. Prior to the agreement with Progen, "CDP did not perform PG or toxicology testing" and TRICARE did not represent a "large portion of CDP's business." *Id.* ¶ 75. This would soon change.

Despite the language within the MSA, Progen sought referrals from federal healthcare programs and submitted claims using CDP's CLIA license and NLIA number. *Id.* ¶ 104. To generate referrals, Progen used requisition forms containing a multitude of lab tests along with a choice to conduct a "Comprehensive Panel." *Id.* ¶ 102. Once received, "the samples went to CDP for testing" and insurance programs reimbursed CDP directly. *Id.* ¶¶ 102, 104. CDP then provided an "Explanation of Benefits" with CDP's name to patients. *Id.* ¶ 102.

Many of the federal referrals came from Prolixus Financial, LLC, d/b/a Alcoholism & Drug Addiction Recovery Group, LLC ("ADAR") through "a scheme to generate lab referrals from soldiers or their family members stationed near Fort Hood." *Id.* ¶¶ 105–06. The ADAR scheme consisted of collecting urine and saliva samples in exchange for $50 Wal-Mart gift cards, shipping the samples to Progen for testing, and billing "TRICARE for medically unnecessary toxicology and DNA cancer screening tests using CDP's CLIA license and NPI number." *Id.* ¶ 115–19. Two of the sales representatives for Rxpress also became marketers for Progen and used ADAR "to generate lab referrals for Progen." *Id.* ¶ 109. For one illustrative claim, CDP sought reimbursement from "TRICARE for twenty types of toxicology tests" by ordering an unnecessary "Comprehensive Panel."

*Id.* ¶¶ 122–23. TRICARE reimbursed CDP for the testing, which paid Progen, which paid the sales representatives for Rxpress, who shared some of their commissions with ADAR. *Id.* ¶¶ 115, 123. Eventually, ADAR obtained signature stamps from doctors to sign off on the tests provided by beneficiaries who never saw a doctor, never received test results, and never knew of the purpose for the samples. *Id.* ¶ 117. Because of this scheme, two sales representatives of Rxpress, the owner and managing partner of ADAR, and the operations manager of ADAR later pleaded guilty to conspiracy to commit healthcare fraud. *Id.* ¶¶ 107–08, 118, 224–27. The improper claims submitted by CDP were associated with the improper lab tests conducted by the ADAR Group. *Id.* ¶ 127.

Cockerell and CDP learned that Progen was performing services for TRICARE beneficiaries around June 2015. *See id.* ¶ 128 (providing an excerpt of CDP's demand for arbitration with Progen from February 2017). Through a series of subsequent meetings, phone calls, and email exchanges, CDP learned more about the federal referrals. *Id.* ¶¶ 130, 134–42, 144. On July 29, 2015, CDP's CFO began to express concern about the relationship with Progen and the receipts of federal reimbursements. *Id.* ¶¶ 145–53. Patients also began to complain about fraudulent testing or unreceived gift cards. *Id.* ¶¶ 174–80, 188. CDP then coordinated with Progen to assume the business name "Origen Laboratories," which would now appear on bills sent to customers and disassociate CDP from future customer complaints. *Id.* ¶¶ 182–84.

On January 11, 2016, CDP sent a retraction letter to TRICARE acknowledging "that CDP had submitted certain claims to TRICARE 'in error'" and that CDP would refund these payments once TRICARE sent a refund letter. *Id.* ¶¶ 189–90. In total, CDP had submitted 46,448 erroneous claims totaling $941,850.77 and TRICARE requested a refund of $923,606.44 from CDP. *Id.* ¶¶ 192–96.

On February 5, 2016, the Dallas Morning News published an article reporting that "Rxpress was accused of paying illegal kickbacks to physicians and commissions to sales reps," that "Schuster and Rall received commissions on TRICARE referrals," and "identif[ying] Xpress Labs—another name used by Progen—for possibl[y committing] TRICARE fraud associated with lab referrals." *Id.* ¶ 198. On the same day, CDP's legal counsel sent the article to Cockerell, CDP's CFO, and CDP's VP of Health Plans. *Id.* Yet, CDP continued to let Progen use CDP's NPI number and CLIA license to submit claims to TRICARE. *Id.* ¶¶ 135, 139, 174, 199. CBS NEWS then reached out to Cockerell with questions and ran an evening news story on June 8, 2016, titled "U.S. military members duped to help pull off insurance fraud." *Id.* ¶¶ 200–02, 205.

CMS conducted an on-site inspection of CDP one week after the CBS NEWS story and one week later, on June 22, 2016, CDP sent a second retraction letter to TRICARE with 4,802 claims worth $3,272,530.98. *Id.* ¶¶ 208–10. The January 11 and June 22 retraction letters combined contain $4,196,137.42 in admittedly improper claims billed to TRICARE by CDP. *Id.* ¶¶ 127, 212. CDP still continued to bill TRICARE and between June 2016 and November 2016 submitted another 817 claims totaling approximately $69,370. *Id.* ¶ 214.

Starting on December 1, 2016, CDP began reimbursing TRICARE and has paid $588,799.65 so far. *Id.* ¶ 219. CDP filed a demand for arbitration and statement of claim on February 6, 2017, against Progen and its principals alleging "fraud, breach of contract, and negligence by inducing [Cockerell] to enter a business relationship" with Progen. *Id.* ¶ 220. CDP sought indemnification from Progen for the "millions of dollars" CDP anticipated owing to the Government. *Id.* ¶ 223. Progen dissolved on or around July 24, 2017. *Id.* ¶ 228. "While the . . . arbitration was pending, Quintan filed a Texas state court suit seeking declaratory judgment and injunctive relief" claiming

he was not personally subject to arbitration since he signed the MSA on behalf of Progen and not as himself. *Id.* ¶ 230. In March 2019, Progen and CDP entered into a Settlement Agreement whereby "Progen's insurance carriers agreed to pay $3,485,000 to CDP." *Id.* ¶ 233. On March 8, 2019, Progen and CDP also signed a Memorandum of Understanding ("MOU") detailing that the purpose of the settlement payment was "to fully repay both (i) the TriCare Claims, and (ii) amounts CDP reasonably believes will be part of the TriCare Claims." *Id.* ¶¶ 235, 237. On March 29, 2019, Progen's insurance carriers paid the settlement payment of $3,485,000 to CDP. *Id.* ¶ 238.

Schuster, Rall, Zeutzius, and Quintan were all indicted on healthcare fraud charges on December 12, 2018. *Id.* ¶¶ 82, 231. "Zeutzius pleaded guilty to one count of conspiracy to defraud the United States and pay and receive kickbacks" totaling $4.5 million "disguised as W-2 wages in exchange for prescriptions payable." *Id.* ¶ 83. Schuster, Rall, and Quintan have yet to face trial. *See generally United States v. Hall*, No. 3:18-cr-623-S (N.D. Tex. filed Dec. 12, 2018).

CDP still owes TRICARE $3,607,337.77 and has not made a payment since March 27, 2019. *Id.* ¶ 239. The Government "issued a civil investigative demand to CDP" requesting documents related to the Progen litigation, but CDP produced the Settlement Agreement and not the MOU. *Id.* ¶ 241. CDP has yet to produce the MOU, and Cockerell and CDP refuse to pay TRICARE back for the claims. *Id.* ¶¶ 241–42.

B.    *Procedural Background*

The Government filed its Complaint on March 22, 2021. Doc. 1, Compl. Defendants filed their Motion to Dismiss on May 21, 2021. Doc. 6, Defs.' Mot. The Government filed a Response on June 21, 2021. Doc. 9, Gov't's Resp. Defendants filed a Reply on July 12, 2021. Doc. 12, Defs.' Reply. The motion is fully briefed and ripe for review.

## II.

## LEGAL STANDARD

*A.     Rule 12(b)(6) Standard*

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). But the court will "not look beyond the face of the pleadings to determine whether relief should be granted based on the alleged facts." *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

In order to survive a motion to dismiss, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

*B.     Rule 9(b) Standard*

Rule 9(b) provides, in pertinent part, that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). When

claims for fraud and negligent misrepresentation are based on the same set of alleged facts, Rule 9(b)'s heightened pleading standard applies. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), *modified on other grounds*, 355 F.3d 356 (5th Cir. 2003)); *see Paul v. Aviva Life & Annuity Co.*, 2010 WL 5105925, at *8 (N.D. Tex. Dec. 14, 2010) (applying Rule 9(b) to fraud and negligent misrepresentation claims that arose out of the same set of facts but were contained in separate counts in the complaint). A dismissal for failure to plead with particularity in accordance with Rule 9(b) is treated as a Rule 12(b)(6) dismissal for failure to state a claim. *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).

The purpose of the FCA is "to discourage fraud against the government." *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). And as a fraud statute, an FCA claim must comply with Rule 9(b) pleading requirements. *United States ex. rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 892 (5th Cir. 2013). The amount of particularity required for pleading fraud differs from case to case. *See Benchmark Elecs.*, 343 F.3d at 724; *see also Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997) (noting that "courts have emphasized that Rule 9(b)'s ultimate meaning is context specific"). A traditional fraud claim requires pleading with particularity the "'who, what, when, where, and how' of the alleged fraud." *Nunnally*, 519 F. App'x at 892 (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)). But "the [common law fraud] standard is not a straitjacket for Rule 9(b)" as "Rule 9(b) is 'context specific and flexible.'" *United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). "[T]o plead with particularity the circumstances constituting fraud for a False Claims Act . . . claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may

nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.* Thus, the standard for pleading fraud under the FCA rests somewhere between the Rule 8 pleading standard and the traditional Rule 9(b) pleading standard. *Nunnally*, 519 F. App'x at 893 n.3.

## III.

## ANALYSIS

The Government asserts a reverse false claim pursuant to 31 U.S.C. § 3729(a)(1)(G). Courts refer to claims brought under this paragraph of the statute as reverse false claims because the defendant's actions "result not in improper payment to the defendant from the government, but rather no payment (or reduced payment) to the government when payment is otherwise obligated." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003). This provision imposes liability on:

> any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

*Id.* Section 3729(a)(1)(G) imposes liability for either making, using, or causing to be made or used, a false record, or concealing, avoiding, or decreasing an obligation to pay money to the Government. *See* 31 U.S.C. § 3729(a)(1)(G) (providing two methods of violating the statute). To establish an reverse false claim, a relator or the Government must prove either: (A) "(1) a false record or statement; (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation," *United States ex rel. Matheny v. Medco Health Sols. Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (addressing

- 10 -

a reverse false claim); *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 632 (N.D. Tex. 2018) (citing *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, 2016 WL 5661644, at *11 (N.D. Tex. Sept. 30, 2016)), or (B) (1) an obligation to pay or transmit money or property to the government; (2) the defendant conceals, improperly avoids, or decreases this obligation; and (3) defendant acted with knowledge. *See* 31 U.S.C. § 3729(a)(1)(G).

Defendants in this case only seek to dismiss the Government's third cause of action, the reverse false claim. Defendants argue the Government failed to sufficiently plead Defendants' concealment, avoidance, or decrease of an obligation owed to the Government with the specificity required by Rule 9(b), and that the MOU or retraction letters cannot establish an obligation. Doc. 6, Defs.' Mot., 6. Defendants also argue that the reverse false claim is redundant of the direct false claims. *Id.* Therefore, there are three issues before the Court: (1) whether the MOU or letters between Cockerell and Progen established an obligation owed to the Government; (2) whether the Government sufficiently pleaded the obligation element for a reverse false claim; and (3) whether the third cause of action is redundant with the first two causes of action and therefore not actionable. The Court will now address each in turn.

A.    *Obligation*

    1.    <u>Whether an obligation exists via the MOU</u>

The Government alleges that Defendants "knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government." Doc. 1, Compl., ¶ 256. Therefore, its reverse false claim is based on the formulation of a reverse false claim found in the latter half of 31 U.S.C. § 3729(a)(1)(G). The first element of this formulation requires the Government to prove Defendants owed an obligation to the Government.

The False Claims Act defines "[o]bligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). The Government focuses its argument on the retention of an overpayment. Doc. 9, Gov't's Resp., 11. So, the Government must prove "an established duty, whether or not fixed, arising . . . from the retention of any overpayment." *Id.* at 10. As interpreted by courts in this circuit, the term "'established' refers to whether there is any duty to pay, while 'fixed' refers to the amount of the duty." *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1037 (5th Cir. 2016). Thus, obligations have three attributes: "(1) they must be 'established dut[ies]'; (2) they need not be 'fixed'; and (3) they can arise from a list of sources, including statutes and regulations." *Id.*

The parties do not take issue with the second attribute. *See* Doc. 6, Defs.' Mot., 6–8; Doc. 9, Gov't's Resp., 11–13. For the third attribute, the Government alleges the duty arises from the MOU and retraction letters between CDP and Progen. Doc. 1, Compl., ¶ 256. The parties main disagreement stems from the first attribute—whether an established duty exists.

Defendants argue the "mere failure to refund false claims the Government paid is not actionable as a reverse false claim." Doc. 6, Defs.' Mot., 6. Furthermore, Defendants contend that concealment of the MOU does not establish an obligation independent of the other false claims. *Id.* at 8. The Government responds by arguing Defendants "admitted to receiving nearly $4.2 million in overpayment from TRICARE" and have not repaid this debt owed to the Government. Doc. 9, Gov't's Resp., 11. The Government argues the cases relied upon by Defendants used a more constrained definition of obligation than applies in this case, so Defendant's reliance on these cases

is misplaced or distinguishable.[4] *Id.* at 11–13. Furthermore, the Government claims that Defendants' admission to owing a debt in two retraction letters and the MOU firmly establishes an obligation. *Id.* at 12.

Therefore, the Court will focus its examination on whether the MOU and retraction letters established a duty and thus, an obligation.

> i.     *Whether Defendants had an established duty to pay the Government*

The duty that gives rise to an obligation can more accurately be described as a "duty to pay" the Government. *Simoneaux*, 843 F.3d at 1040 (distinguishing between a fine or penalty and a duty to pay such as with custom laws). An established duty is also one existing at the time of liability. *Id.* at 1037–40. Thus, the Government must prove an established duty to pay the Government that existed at the time Defendants incurred liability.

Turning to the facts as alleged, the Settlement Agreement required the insurance carriers for Progen to pay $3,485,000 to CDP (the "Settlement Payment") within thirty days of the execution of the agreement. Doc. 6-1, Settlement Agreement, 2. The Settlement Agreement makes no mention of the Government or an obligation to forward this amount to the Government in lieu of debts owed by Progen to the Government for TRICARE overpayments. *Id.* Four days later, the principals of Progen, Progen, and CDP signed a separate MOU stating "CDP shall use the Settlement Payment to fully repay both (i) the TriCare Claims, and (ii) amounts CDP reasonably believes will be part of the TriCare Claims." Doc. 1, Compl., ¶¶ 235, 237. It is this MOU that the Government

---

[4] Prior to 2009, the FCA did not define obligation. The Fraud Enforcement and Recovery Act of 2009 added a definition for obligation which resolved a dispute a amongst the circuit courts as to whether an obligation must be fixed. *Simoneaux*, 843 F.3d at 1037–38.

argues establishes the legal duty for CDP to pay the Government thus establishing an obligation under the FCA.

Significantly, the MOU essentially reduced the acknowledgement of debt from the January 11 and June 22 retraction letters to a single writing. The first retraction letter declared a debt owed to TRICARE by CDP. *Id.* ¶ 196. In response, TRICARE requested $923,606.44. *Id.* The second retraction letter contained claims totaling $3,272,530.98, but TRICARE did not respond to this letter.[5] *Id.* ¶¶ 210, 213. Taken together, these letters totaled $4,196,137.42 in improper claims, which is an overpayment. *Id.* ¶ 212. Subtracting the $588,799.65 CDP reimbursed to TRICARE, CDP still owes $3,607,337.77 of this overpayment to the Government. *Id.* ¶ 219. The MOU transferred $3,485,000 from Progen insurance carriers to CDP. *Id.* ¶ 238. The amount in the MOU is therefore only $122,337.77 shy of the amount in controversy, representing nearly 97% of the $3,607,337.77 the Government alleges CDP owes. Since receiving the Settlement Payment, CDP has not paid the Government any of this remaining overpayment. *Id.* ¶ 219. Therefore, CDP has retained an overpayment that they knew upon receipt that they were not entitled to and thus, had an obligation to the Government. *See United States Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 709 (M.D. Fl. 2017) (finding Government sufficiently pleaded an obligation for defendants knowingly receiving funds and retaining them); *United States ex rel. Herbold v. Doctor's Choice Home Care, Inc.*, 2019 WL 5653459, at *15 (M.D. Fl. Oct. 31, 2019) (finding awareness of tainted claims sufficient to show avoidance of an obligation). Thus, the Government has sufficiently alleged an obligation exists for the reverse false claim.

---

[5] Presumably, TRICARE did not respond because this FCA investigation began shortly thereafter.

2.    Whether the Government Sufficiently Pleaded the Obligation According to Rule 9(b)

Under the traditional Rule 9(b) fraud pleading requirements, a plaintiff must establish the "who," "what," "where," "when," and "how" of the claim. *Nunnally*, 519 F. App'x at 892. But, as discussed earlier, the standard for an FCA claim lies somewhere between the standard Rule 8 pleading requirements and the traditional fraud pleading requirements of Rule 9(b). *See Grubbs*, 565 F.3d at 189–90 (discussing the requirement of context when pleading fraud); *United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, 2021 WL 4502275, at *5 (N.D. Tex. Oct. 1, 2021) (analyzing the pleading standard for an FCA claim). Therefore, if the Government sufficiently pleaded the "who," "what," "where," "when," and "how" of the claim, the Government necessarily surpassed the threshold pleading requirement for an FCA claim.

Defendants attack the alleged concealment, avoidance, or decrease in an obligation owed to the Government as not pleaded with the particularity required by Fed. R. Civ. P. 9(b). Doc. 6, Defs.' Mot., 8–9. In particular, Defendants argue a reverse false claim "imposes liability on one who 'knowingly conceals or knowingly and improperly avoids or decreases *an obligation to pay . . . the Government*,' (emphasis added) not one who supposedly conceals a document" containing an overpayment. *Id.* at 9. Under Defendants' theory, concealing the MOU requiring CDP to repay $3,485,000 to the Government cannot establish concealment of an obligation owed to the Government. *Id.* at 9; Doc. 12, Defs.' Reply, 2. Defendants also argue that the Government failed to sufficiently plead the reverse false claim because the Government's Complaint only relies upon the MOU to establish the grounds for the claim. Doc. 12, Defs.' Reply, 2. The Government's response to the motion to dismiss, Defendants state, relies on the letters to TRICARE because the Government cannot establish the elements of a reverse false claim with only the MOU. *Id.* at 3.

Thus, the Government's Complaint—that relied on the MOU alone—is insufficient. *Id.* Defendants conclude that the MOU-based pleading fails to establish the requisite concealment, avoidance, or decrease in any payment owed to TRICARE. Doc. 12, Defs.' Reply, 2. Defendants finally contend the Government knew of the MOU, so Defendants never concealed the document from the Government. Doc. 6, Defs.' Mot., 10.

The Government argues that its complaint plausibly alleges that the retraction letters and MOU establish that Defendants admitted to owing an obligation to the Government. Doc. 9, Gov't's Resp., 11–13. Also, the complaint plausibly alleges the Defendants withheld evidence by not providing the MOU to the Government, which shows the Defendants avoided an obligation owed to the Government. *Id.* at 13–15. The Government contends that Defendant Cockerell obtaining a settlement from his former business partners along with a promise to repay the Government and subsequently hiding the deal, improperly avoided an obligation owed to the Government in violation of the FCA. *Id.* at 15. In the alternative, the Government argues that if it fails to show concealment, it may show improper avoidance or a decrease in an obligation to pay the Government—which the Complaint properly alleges. *Id.* at 14. Lastly, the Government contends that the Complaint plausibly establishes the scienter element by alleging facts about the money owed, how much had been paid to the Government, the suit with Progen, and the subsequent agreement to repay the amount owed to the Government. *Id.* 15–17.

First, the Court does not need to determine at this stage of the case whether the MOU alone or the MOU in conjunction with the letters to TRICARE establishes the grounds for the false claim, since the Government appropriately incorporates the preceding paragraphs within the Complaint into its third cause of action. *See* Doc. 1, Compl., ¶ 254. *Cf. Roe v. Johnson Cnty.*, 2019 WL 5031357,

at *5 (N.D. Tex. July 29, 2019) (dismissing a complaint as a shotgun pleading for incorporating the preceding paragraphs of allegations for seventy separate claims).

Second, because the Government relies on the latter half of 31 U.S.C. § 3729(a)(1)(G) for their reverse false claim, the Government must have sufficiently pleaded that the Defendants "knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the Government" per the strictures of Rule 9(b). The Defendants attack the sufficiency of the pleading of the concealment, avoidance, or decrease of an obligation to pay the Government money, which is the "what" and "how" of this claim. Doc. 6, Defs.' Mot., 8–9. The Government alleges that "what" the Defendants did was conceal or avoid an obligation to pay money to the Government and "how" the Defendants did this was by not apprising the Government of the MOU or sending the money from the Settlement Agreement to TRICARE. Doc. 1, Compl., ¶ 256; Doc. 9, Gov't's Resp., 11–15. Furthermore, the Government provides the exact amount of the unreimbursed overpayment ($3,607,337.77), the dates CDP admitted to receiving an overpayment (January 12 and June 22 of 2016), and CDP's alleged actions to conceal or avoid paying the Government (withholding the MOU after a civil investigative demand from the Government and no longer paying TRICARE for the overpayments). Doc. 1, Compl., ¶¶ 189, 209, 219, 239, 241–42. The statute also turns on Defendants' actions and not what the Government knew at the time. *See* 31 U.S.C. § 3729(a)(1)(G) (holding liable "any *person* who . . . knowingly conceals or knowingly and improperly avoids"). This sufficiently pleads the "what" and "how" elements of a traditional fraud claim. Additionally, because the Court found above that an independent obligation exists through the retraction letters and MOU, CDP's actions—as alleged by the Government—plausibly demonstrate an attempt to conceal or avoid the obligation to the Government.

- 17 -

In summary, the third cause of action sufficiently apprises Defendants of the reverse false claim and is sufficiently pleaded according to the strictures of Rule 9(b) to survive the motion to dismiss on these grounds.

B.    *Redundancy*

The Government may not recast its other false claims as a reverse false claim. *See United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514–15 (E.D. Pa. 2010); *United States ex rel. Porter v. HCA Health Servs. of Okla.*, 2011 WL 4590791, at *8 (N.D. Tex. Sept. 30, 2011).  The purpose of the reverse false claim provision of the FCA is "to address conduct that would otherwise escape liability under the FCA." *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, 2016 WL 5661644, at *11 (N.D. Tex. Sept. 30, 2016) (citing *Thomas*, 708 F. Supp. 2d at 514). Therefore, the Government must allege separate conduct for the reverse false claim from the conduct asserted within the other false claims.

Defendants argue the reverse false claim restates the first and second causes of action and relies on the same set of operative facts. Doc. 6, Defs.' Mot., 6–8. Defendants claim that the Government's reliance on the same "Background" section for each of the claims in the Government's Response further reinforces that the claims rely on the same operative facts. Doc. 12, Defs.' Reply, 4. Defendants also argue that the requirement that the Government show improper avoidance of an obligation requires the Government to rely on the same allegedly improper conduct that forms the basis of its other claims. *Id.* at 5. Additionally, Defendants argue that the reverse false claim and the other claims all "seek to recover the same payments." *Id.* Defendants point to cases where courts dismissed reverse false claims when a plaintiff recast the allegations from the other false claims as reverse false claims. Doc. 6, Defs.' Mot., 8.

Defendants rely on *HCA Health Servs.* for the contention that the Government is seeking to impose double liability for the same allegedly fraudulent actions. *Id.* at 7 (citing *HCA Health Servs.*, 2011 WL 4590791, at *8). In *HCA Health Servs.*, a relator brought false certification, fraudulent inducement, and reverse false claims. 2011 WL 4590791, at *5–8. The relator alleged the "[d]efendants concealed the fact they were not in compliance with [federal law] and therefore not entitled to accept interim reimbursements." *Id.* at *7. The relator concluded that the defendants' false statements prevented the government from attempting to recover the "improperly paid claims." *Id.* The court found the relator's allegations a recitation of the other false claims—but in reverse—and therefore, not actionable. *Id.* at *8. Additionally, the court found the improper Medicare reimbursements to the defendants did not establish "any obligation on Defendants to reimburse any Medicare payments." *Id.*

Defendants next cite to *United States ex rel. Ligai v. ETS-Lindgren Inc.*, 2014 WL 4649885 (S.D. Tex. Sept. 16, 2014), *aff'd sub nom. United States ex rel. Ligai v. ESCO Techs., Inc.*, 611 F. App'x 219 (5th Cir. 2015) (affirming lower court ruling on FCA claims, but not addressing the reverse false claim). In *Ligai*, the relator alleged "that the 'defendants received overpayments because the payments received were obtained through fraud and would not have been paid were the fraud known to the Government.'" 2014 WL 4649885, at *12. The payments at issue were allegedly conditioned on compliance with certification standards. *Id.* at *5. For the reverse false claim, the court held that the relator failed to allege the defendant "knowingly made a false record or concealed its obligation" to remit payments to the government. *Id.* at *13. Additionally, the relator had not shown that an obligation existed or that the government had imposed an obligation to repay the payments. *Id.* (citing *HCA Health Servs.*, 2011 WL 4590791, at *8). The relator could then not recast the direct

false claims as reverse false claims to avoid the direct claim's false certification requirement. *Id.*

Defendants then cite to *United States ex rel. Ruscher v. Omnicare, Inc.*, 2014 WL 2618158 (S.D. Tex. June 12, 2014). In *Ruscher*, the relator alleged for the direct false claim that "[skilled nursing facilities] used Medicare and Medicaid cost reports to get claims paid," which were tainted by kickbacks from a defendant. 2014 WL 2618158, at *27. For the reverse false claim, the relator alleged that the skilled nursing facilities used the Medicare and Medicaid cost reports to conceal reimbursements owed to the Government. *Id.* The court found these two claims to be "two sides of the same coin." *Id.* The same set of operative facts supported both claims and the liability at issue arose from the direct false claim. *Id.*

The last case cited by Defendants is *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, 2016 WL 5661644 (N.D. Tex. Sept. 30, 2016). The relator alleged that two "[Medicare Advantage] organizations had a duty to report and return any overpayments received from the Government." *Ramsey-Ledesma*, 2016 WL 5661644, at *11. The court found the relator's reverse false claim not actionable because it was based on the same actions of the—"fail[ure] to refund capitated payments they were not eligible to receive"—as the other false claims. *Id.* The purpose of a reverse false claim, the court noted, is "to address conduct that would otherwise escape liability under the FCA, not to provide a duplicate basis to assert a false statement claim under the Act." *Id.* (citing *Thomas*, 708 F. Supp. 2d at 514).

Taking these cases together, a reverse false claim cannot merely recite or recast the other claims in reverse, be the other side of a coin to a direct false claim, or provide a duplicate basis for liability. Furthermore, the obligation to repay the government must arise from something more than merely retaining an overpayment or an improperly obtained payment from the Government. *See*

*HCA Health Servs.*, 2011 WL 4590791, at *8; *Ligai*, 2014 WL 4649885, at *12; *Thomas*, 708 F. Supp. 2d at 515.

      The Government rebuts Defendants' contention that the reverse false claim duplicates the other false claims. *Id.* at 17–20. The Government alleges the reverse false claim relies on facts arising after Defendants admitted owing refunds to TRICARE. *Id.* at 17. The Government claims that after the admission, the Defendants then hid and withheld the money from the Government. *Id.* at 18. The Government also attacks the cases cited by Defendants as inapposite because the plaintiffs in those cases relied on the same false certification to allege a false claim and reverse false claim. *Id.* at 18–19. Here, the Government relies on false certifications to submit claims for the first and second causes of actions, but the third cause of action—the reverse false claim—relies on the Defendants' refusal to repay the debt owed the Government. *Id.* at 19–20.

      Both parties agree that the separate claims cannot arise from "the same nucleus of operative facts." Doc. 12, Defs.' Reply, 4 (quoting Doc. 9, Gov't's Resp., 19). The Government states that the claims here do not. Doc. 9, Gov't's Resp., 19–20. As for the reverse false claim, Government's Complaint alleges that "CDP and Dr. Cockerell represented and warranted that the full $3,485,000 payment from Progen would be used to reimburse TRICARE," yet "CDP and Dr. Cockerell concealed from the United States the MOU" containing their agreement with Progen. Doc. 1, Compl., ¶ 256. The first direct false claim, by contrast, alleges "[CDP] and [Cockerell] submitted or caused the submission of fraudulent lab testing services generated by Progen." *Id.* ¶ 245. And the second direct false claim alleges "[CDP] and [Cockerell] conspired and entered into an agreement with Progen and its principals to have the United States pay for false or fraudulent claims." *Id.* ¶ 251. Thus, the Government argues the claims rely on separate and distinct operative facts. Doc. 9, Gov't's

Resp., 17. The reverse false claim alone, it states, relies on two retraction letters mailed by Defendants to TRICARE admitting overpayment and erroneously submitting claims, and the settlement agreement and subsequent MOU between Progen and CDP where CDP "represented and warranted to Progen that they would use the $3,485,000 settlement to reimburse TRICARE." *Id.* at 17–18.

Applying the caselaw to these facts and viewing the facts in the light most favorable to the Government when considering a motion to dismiss, the Court finds the reverse false claim is not redundant of the first and second claims in the Complaint for two reasons.

First, even though the reimbursement required for the reverse false claim stems from the actions alleged in the direct false claims, the Government alleges a separate "obligation that arose independent of the affirmative false claims." *See Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC*, 512 F. Supp. 3d 1096, 1120 (D. Haw. 2021) (quoting *United States ex rel. Schaengold v. Mem'l Health*, 2014 WL 6908856, at *21 (S.D. Ga. Dec. 8, 2014)); *see also United States ex rel. Herbold v. Doctor's Choice Home Care, Inc.*, 2019 WL 5653459, at *15 (M.D. Fl. Oct. 31, 2019) (rejecting redundancy argument because the Government alleged independent obligations). In other words, all three causes of action seek to recover the same pot of money, but the reverse false claim stems from an obligation not then existing at the time the liability for the direct false claims arose. *See United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.*, 906 F. Supp. 2d 1264, 1272–73 (N.D. Ga. 2012) (finding relator sufficiently alleged a false claim for the submission of claims resulting in excessive reimbursement and a reverse false claim for a failure "to disclose and refund the overpayments it received for overfill reimbursements"); *Schaengold*, 2014 WL 6908856, at *19–21 (distinguishing the case from *Thomas*, *Ruscher*, and *HCA Health Servs.*). The first and second causes of action stem from

the "submission of thousands of false or fraudulent claims," Doc. 1, Compl., ¶ 245, and the third

cause of action arises from the MOU and retraction letters obligating Defendants to repay the Progen

claims. Therefore, the Court finds that the claims each stem from separate sets of operative facts and

are not redundant.

Second, each cause of action concerns events occurring at different times. While the MOU

between Progen and CDP was drafted to cover the direct false claims liability and now serves as the

basis for liability for the third cause of action, the alleged events of concealing the debt had not

arisen. When the MOU was signed, Defendants had already allegedly committed the acts to incur

liability for the first two causes of action, but not the third. As the Government alleges, the first and

second causes of action stem from events taking place between March 2015 and November 2016,

Doc. 1, Compl., ¶ 2. The first cause of action arose from the submission of fraudulent testing services

and the second cause of action arose from an alleged conspiracy between Defendants and Progen to

defraud the Government. *Id.* ¶¶ 243–53. The third cause of action did not arise until on or about

March 7, 2019, when Defendants entered into the Settlement Agreement and subsequent MOU

with Progen. *Id.* ¶¶ 233–37, 256. Therefore, the third cause of action is not redundant of the first

two causes of action.

## IV.

## CONCLUSION

The Court finds the Government sufficiently pleaded the third cause of action and the

Court thus, **DENIES** CDP and Cockerell's motion to dismiss (Doc. 6).

SO ORDERED.

SIGNED: October 20, 2021.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE